IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

JANET E. MOHNKERN,

                Plaintiff,           Case No. 3:02 CV 7206

-vs-

                              MEMORANDUM OPINION

THE PROFESSIONAL INSURANCE
COMPANY, etc.,

                Defendant.

KATZ, J.

This matter is before the Court on the Defendant's motion for summary judgment[1] (Doc. No. 39) and Plaintiff's motion for partial summary judgment (Doc. No. 42). As the parties have briefed the issues, the motions stand ready for adjudication by this Court. Jurisdiction is premised upon 28 U.S.C. § 1332.

## BACKGROUND

This is one of a number of satellite cases spawned by the litigation in *Liberte Capital Group et al. v Capwill*, Case No. 5:99 CV 818 (N.D. Ohio) and involving the viatical insurance industry[2].

It is undisputed that The Professional Insurance Company f/k/a The Professional Insurance Corporation ("PIC") issued a life insurance policy, Policy No. 2063622M, to Broderick J.

---

[1] Although initially filed as a motion to dismiss, the Court converted Defendant's motion to one for summary judgment on May 22, 2006 (Doc. No. 43).

[2] For the background to the underlying action, see *Liberte Capital Group, LLC v. Capwill,* 229 F.Supp.2d 799 (N.D. Ohio 2002).

Blacknell ("Blackness"), a Florida resident, in the amount of $100,000. However, Blacknell's health problems and attendant medical bills led to him selling his policy in return for a sum less than the policy limits.

In November 1998, Janet E. Mohnkern ("Mohnkern") invested $100,00 with Alpha Capital Group ("Alpha"), which solicited investors for placements in viatical settlements. Mohnkern's funds were placed in escrow with Viatical Escrow Services, LLC ("VES") until she was placed in a policy in the Blacknell policy. On March 9, 1999, Mohnkern was assigned the Blacknell policy in exchange for $49,995.00 of her initial $100,000 investment. The remainder of Mohnkern's investment was placed in another policy and is not at issue in this litigation. The assignment of the Blacknell policy to Mohnkern was recorded by PIC in April 1999 noting the "Approval of Absolute Assignment with Janet E. Mohnkern." (Amended Compl., Ex. B.)

To fully understand the backdrop against which the present dispute arose, the Court refers to the history in *Liberte* as articulated by the Sixth Circuit Court of Appeals:

> In April 1999, after the assignment of the Blacknell Policy to Mohnkern but before Blacknell's death, Liberte and Alpha commenced an action in district court against their escrow agent James A. Capwill and his companies, Viatical Escrow Services, LLC and Capital Fund Leasing [hereinafter Capwill].FN2 The suit alleged that Capwill misappropriated funds it held in escrow for Liberte and Alpha, including Mohnkern's investment. Shortly thereafter, the district court appointed a Receiver [hereinafter Receiver # 1]. *See Liberte Capital Group, LLC v. Capwill*, 229 F.Supp.2d 799, 799 (N.D.Ohio 2002). The order of appointment instructed Receiver # 1 "to satisfy the claim of creditors, including investors and other parties, in the order of legal priority ...." FN3 *See* \*381 *Liberte Capital Group, LLC v. Capwill,* 99 Fed.Appx. 627, 628 -29 (6th Cir.2004). Accordingly, between February 2000 and November 8, 2000, Receiver # 1 disbursed proceeds of life insurance policies of deceased insured to matched investor-beneficiaries. *Id* at \*628-32.
>
> FN2. Liberte filed the action on April 9, 1999. Alpha intervened in the suit shortly thereafter.

2

> FN3. The district court expanded the Receiver's duties on November 9, 1999, "to cover all interests in any and all insurance policies funded by investors which Liberte Capital, LLC or Alpha Capital, LLC contacted, which are or were in the name of James A. Capwill, Capwill & Co., CWN Group or any other name, either as nominee owner or as trustee ... for the purpose of managing and administering insurance policies in which one of the foregoing either is named as owner, beneficiary or Trustee, including, but is not limited to death claims ...." *Id.* at \*2.

*Liberte*, 421 F.3d at 379.

Blacknell passed away on November 14, 2000. Due to difficulties in ascertaining information about the location of Blacknell's death, it was not until October 1, 2001, that Alpha's escrow agent, NorthEast Escrow Services, LLC ("NES"), forwarded the certified death certificate and a copy of the policy assignment to Mohnkern. Approximately ten days later, Mohnkern submitted her claim to PIC on the Blacknell policy. The claim form indicates it was received on October 12, 2001 by Retirement Accounts, Inc., forwarded to PIC and received by them on November 2, 2001. (*Id.* at Ex. C.)

In investigating the claim, PIC determined that Mohnkern was not the named beneficiary to the policy which required, in part, that Blacknell's estate sign off on the claim. By letter dated November 12, 2001, PIC advised Mohnkern that it needed certain documentation in order to proceed with the processing of her claim. PIC states, and Mohnkern does not dispute, that PIC received the requested documentation from her on November 26, 2001.

By early January 2002, PIC stood ready to pay the policy proceeds to Mohnkern. On January 3, 2002, PIC emailed Mohnkern that it was waiting to hear from NES on the status of the premium payments and wanted clarification from Mohnkern as to whom premium payment refunds were to be returned. On January 4, 2002, PIC received an email from NES and responded to NES as follows:

3

> Hi Lynn,
> Thank you for your e-mail. I authorized payment of the policy proceeds to Janet Mohnkern this morning. If you believe this decision is incorrect please let me know as soon as possible. I have not received confirmation yet as to when the check will go out but I'm assuming a few days. I will let Janet Mohnkern know as soon as I receive confirmation. My decision was based on the collateral assignment. The only remaining information I needed from you was on the premium refund. I believe that premiums were paid for a few months following the date of death. Janet Mohnkern believes that the premium refund should go to her, but I wanted to get your agreement on that issue prior to returning premiums to Janet. Do you agree that any excess premium payments should go to Janet Mohnkern and not to NorthEast Escrow Services? Thank you very much for your help with this matter.
> Scott Holman
> GE Financial Assurance

(*Id.* at Ex. H.)

Later, that same day, NES advised PIC of the following:

> Dear Scott:
> Have been directed by the Federal Court-appointed Receiver, Mr. William Wuliger to express our concern over the payment of this death benefit. I understand that this death claim has been in the process for many months, but it is Mr. Wuliger's position that the court must okay the payment of this benefit. Mr. Wuliger is putting a motion before the court today for direction.
> Will forward to you, by mail, a letter explaining the situation along with the motion from court appointing Mr. Wuliger the Receiver and NorthEast Escrow Services as the court-appointed escrow agent over Alpha Capital Group.
> We then ask for your patience. Will forward to you the motion as who is to be paid, as soon as receive it.
> Unfortunately, this policy is wrapped up in the receivership (of Alpha Capital Group) and Mrs. Mohnkern does not know the decision by Mr. Wuliger to allow the court to decide.
> Thank you.
> Lynn Day
> Operations

(*Id.*, Ex. H.)

PIC advised Mohnkern of these developments on January 6, 2002. The Receiver filed his

motion on the Blacknell death benefit in the *Liberte* action on January 7, 2002 and it was approved

4

by the Court on January 10, 2002. In accordance with the directive in the Court order, PIC payed the proceeds from the Blacknell policy to NES, the escrow company utilized by the Receiver and at the Court's direction, NES placed the monies in a segregated account.

Mohnkern filed this litigation on March 8, 2002, in the Middle District of Florida and it was subsequently transferred to this venue on April 19, 2002. Following unsuccessful settlement discussions, this Court stayed the case *sub judice*, until Mohnkern intervened in the *Liberte* action regarding her contractual rights. Subsequent to a fairness hearing on the method of distribution regarding the Alpha investors, Mohnken's motion for release and distribution of the Blacknell proceeds was dismissed. On appeal, the Sixth Circuit reversed and remanded "for a hearing as to the ownership of the Blacknell Policy proceeds, consistent with Mohnkern's due process rights. *Liberte Capital Group, LLC v. Capwill*, 421 F.3d 377, 385 (6th Cir. 2005).

In December 2005, Mohnkern and the Receiver resolved the contractual dispute and Mohnkern received $105,000 in return for settlement of her contractual claim. Upon notification of that settlement, the Court lifted the stay in the present lawsuit.

Mohnkern sets forth four causes of action in her amended complaint as follows: (1) that Defendant's failure or delay in payment was a violation of Florida statute §§ 624.155 and 627.421; (2) that Defendant acted unreasonably and in violation of Plaintiff's statutory rights; (3) that Defendant has an absolute statutory obligation to pay her attorney fees and interest in accordance with Florida law; and (4) declaratory relief in regards to Plaintiff's entitlement to attorney fees and interest under Florida law.

**MOTION FOR SUMMARY JUDGMENT STANDARD**

5

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56©).  The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.* at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2541, 91 L. Ed. 2d 202 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position.  *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### CLAIM FOR ATTORNEY FEES UNDER FLORIDA STATUTE

*A. Florida Statutory Scheme*

The relevant Florida statute reads in pertinent part:

**627.428. Attorney's fee**
(1) Upon rendition of a judgment or decree by any of the courts of this state against an insurer and in favor of any named or omnibus insured or the named beneficiary under a policy or contract executed by the insurer, the trial court or, in the event of an appeal in which the insured or beneficiary prevails, the appellate court shall adjudge or decree against the insurer and in favor of the insured or beneficiary a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had.

The general or American Rule regarding attorney fees is that each party generally bears its own fees absent a contract or statute to that effect. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S. Ct. 1612 (1975). Florida's statute is an exception to the American rule and "must be strictly construed because an award of attorneys' fees is in derogation of common law." *Pepper's Steel & Alloys, Inc. v. United States*, 850 So.2d 462, 462 (Fla. 2003).

The entitlement of attorney fees is a question of law. *Equitable Life Assurance Soc'y of U.S. v. MacGill*, 551 F.2d 978, 983 (5th Cir. 1977). Moreover, this Florida statute has been deemed to be substantive law for *Erie*[3] purposes. *All Underwriters v. Weisberg*, 222 F.3d 1309, 1311-1312 (11th Cir. 2000). The statute is not only applicable to Florida courts, both state and federal, but also to actions instituted in Florida and subsequently transferred to another forum. *Carr v. American Universal Ins. Co.,* 341 F.2d 220, 224-225 (6th Cir. 1965).

With regard to the motivation behind this statute, the Florida Supreme Court has stated the following:

> [T]he statute's purpose "is to discourage insurance companies from contesting valid claims, and to reimburse insureds for their attorney's fees incurred when they must enforce their contract with the insurance company." *Bell v. U.S.B. Acquisition Co.,* 734 So.2d 402, 411 n.10 (Fla. 1999).

*Pepper's Steel & Alloys, Inc. v. United States,* 850 So.2d at 465. *See also, Insurance Co. of North America v. Lexow*, 602 So.2d 528, 531 (Fla. 1992).

The punitive nature of the statute is also evident in the case law surrounding this statute. *See e.g., Bassette v. Standard Fire Ins. Co.,* 803 So.2d 744, 746 (Fla. 2001) ("purpose of section 627.428 is to penalize an insurance company for wrongfully causing its insured to resort to

---

[3] *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817 (1938).

8

litigation"); *Government Employees Ins. Co. v. Battaglia,* 503 So.2d 358, 360 (Fla. 1987); *American Nat'l Ins. Co. v. de Cardenas,* 181 So.2d 359, 361 (Fla. 1965) (statute on assessing attorney's fee under [predecessor] Florida statute "is in the nature of a penalty and should be strictly construed."

*B. Analysis*

The central issue for resolution is whether the present dispute falls within the scope of Florida statute § 627.428. For the reasons that follow, the Court is of the view that the unique circumstances of this situation do not require application of §627.428.

Initially, it must be noted that there was no denial of coverage by PIC to Mohnkern. Both sides acknowledge that PIC stood ready to pay Mohnkern on the death claim. That position is corroborated by the filings in the *Liberte* action by the Receiver: "NorthEast Escrow has now been advised by the legal department of GE Financial Assurance company, that they are ready, willing and able to pay this death claim." *Liberte*, Doc. No. 1374, p. 1, ¶ 2.

The Court's Order of January 10, 2002, in response to the Receiver's motion for direction, stated in pertinent part::

> The Court directs that GE Financial Assurance Corporation pay the death benefits on this claim to NorthEast Escrow Services, the escrow company being utilized by the Alpha Receiver.

*Liberte*, Doc. No. 1379. Moreover, PIC was placed on notice of the Receiver's intent to request Court intervention, was advised of an imminent court order and advised Mohnkern of those developments. That PIC heeded a court order does not equate to denial of a claim or wrongful conduct. "Where the claim is one that the carrier reasonably can expect to be resolved by a court, rather than by itself, then section 627.428 does not generate a punitive fee." *Government*

9

*Employees Ins. Co. v. Battaglia,* 503 So.2d 358, 360 (Fla. 1987). Here, the delay was a direct result of court intervention, an event over which PIC had no control.

A somewhat analogous situation arose in *Battaglia*, where the insured initially pursued litigation against the tortfeasor and the tortfeasor's insurer. When the tortfeasor disappeared and the tortfeasor's insurer denied coverage, the insured sought arbitration with his own insurer, GEICO[4] related to the uninsured motorist coverage. With arbitration ready to commence, the tortfeasor was located, deposed and the tortfeasor's insurer reinstated its coverage. GEICO then moved to stay arbitration and initiated a declaratory judgment action on the uninsured motorist coverage. The trial court granted the insurer's motion for a stay and denied the pending motions for summary judgment. The tortfeasor disappeared yet again and his insurer disclaimed coverage for a second time. The insured then filed a new summary judgment motion asking for a declaration of uninsured motorist coverage as against GEICO. The trial court granted the summary judgment motion and GEICO and the insured were ordered to continue the arbitration. The insured then sought attorney fees and costs under § 627.428 and was granted fees of $12,000, which represented the time period prior to the court entering the stay of arbitration. In reversing the award of attorney fees, the Florida appellate court noted that there was no evidence of a wrongful denial of coverage and that GEICO's action in seeking declaratory relief and a stay was reasonable in light of the tortfeasor's insurer's coverage at that point in time. Moreover, the appellate court noted that an award of fees under §627.428 would punish GEICO for the trial court's order staying the arbitration as well as its erroneous denial of summary judgment. 503 So.2d at 361.

---

[4] Government Employees Insurance Company.

Like GEICO in *Battaglia,* PIC did not deny coverage. In the course of tying up loose ends, PIC communicated with the escrow company that it stood ready to make the payment to Mohnkern and also sought clarification on who was entitled to the premium refunds. That communication, which indicated payment and sought information on the premiums, triggered a red flag *on the part of the escrow company who reported to the Receiver*. It was the Receiver's action and resulting court order which halted PIC from paying the proceeds to Mohnkern.

Attorney fees have also been denied in instances where the initial denial of claim was based upon erroneous information provided by the insured. *Liberty National Life Ins. Co. v. Bailey*, 944 So.2d 1028, 1030 (Fla. 2006) (rejecting imposition of strict liability under 627.428 where a valid claim is not submitted). Where the insurer had paid over $1 million dollars in claims, was in the process of adjusting remaining claims and delays in payments were due to insured's failure to provide timely information with supporting documentation, the insured was not entitled to attorney fees absent of showing of incorrectly denied benefits. *Tristar Lodging v. Arch Specialty Insurance Co.,* 434 F.Supp.2d 1286, 1300 (M.D. Fla. 2006) (noting difference between existence of a bona fide dispute and mere *possibility* of a dispute as crucial in determining whether payments by insured are treated as confessions of judgment), *aff'd*, Case No. 06-13989 (11th Cir. Jan. 26, 2007). Additionally, attorney fees have been denied where the insurer could not reasonably be expected to resolve factual and legal issues and the conflict was forced into court. *Crotts v. Bankers and Shippers Ins. Co. of New York,* 476 So.2d 1357, 1359 (Fla. 1985) (factual issue involved conflicting claims to insurance proceeds and legal questions revolved around applicability of Florida statute which exempted disability payments from legal process). *See also, Time Ins. Co. v. Arnold,* 319 So.2d 638, 639 (Fla. 1975); *Equitable Life*

*Assurance Soc'y of U.S. v. Nichols,*, 84 So.2d 500, 502 (Fla 1956) (under predecessor statute no attorney fees absent wrongful conduct by insurer).

While the recitation of Florida case law, in Plaintiff's memoranda, is correct insofar as it reflects general legal principles, this Court disagrees with the Plaintiff's characterization of *Sanchez v. American Ambassador Cas. Co.,* 559 So.2d 344 (Fla. 1990). In *Sanchez*, plaintiff's claim was pending with the insurer for four years and Plaintiff ultimately filed a petition against the insurer to compel arbitration. The insurer attempted to dismiss the plaintiff's petition and ultimately the trial court issued an order compelling arbitration but noted in its order that the insurer had conceded the plaintiff's right to arbitration. The trial court then denied plaintiff' motion for attorney fees. The appellate court reversed, noting that the insurer delayed any action until it was forced to respond to plaintiff's action on compelling arbitration. Even then, the insurer did not admit or dispute coverage but continued to challenge plaintiff's right to arbitration. Despite the absence of a formal rejection, the failure to respond coupled with the insurer's challenge to the petition for arbitration was tantamount to denying coverage. The appellate court noted that it was within the insurer's power to communicate its position on coverage and respond to plaintiff's demand for arbitration prior to suit, which amounted to "inaction wrongfully caus[ing] Sanchez to resort to litigation which ultimately resulted in the trial court rendering a judgment in Sanchez's favor which compelled arbitration." 559 So.2d at 347. Therefore, the Plaintiff's characterization that the Sanchez panel" held that *any* action compelling the insured to resort to litigation where the insured is ultimately entitled to policy proceeds triggers the statutory entitlement to attorney fees",[5] is only true where a carrier "wrongfully caus[es] its insured to resort

---

[5] Plaintiff's Memorandum in support of its Motion for Partial Summary Judgment (Doc. No. 42 at p. 12).

12

to litigation when it was within the carrier's power to do so." *Id.* (Emphasis added.) The circumstances in the case *sub judice* present a markedly different scenario than the cases in which attorney fees under §627.428 are generally granted.

The Court also recognizes the difficult position in which Plaintiff was placed in by virtue of the January 10, 2002 Order. It is an understatement to say that the financial debacle resulting from the *Liberte* action and its principals has been borne by the investors. However, taking into consideration PIC's action and responses to the Receiver and Court order, to award attorney fees under § 627.428, in this instance, would be to penalize an insurer when it was without power to resolve the conflict and would be contrary to the intent of the statute. Construing the undisputed facts in the light most favorable to the Plaintiff, the Court cannot find that PIC wrongfully caused Mohnkern to resort to litigation and further that §627.428 is not applicable in this instance.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (Doc. No. 39) is granted and Plaintiff's motion for partial summary judgment (Doc. No. 42) is denied.

IT IS SO ORDERED.

   S/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE